## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____
                                                        )
**UNITED STATES OF AMERICA,**          )
                                                        )
           **Plaintiff,**                        )
                                                        )
**v.**                                                )          **Case No. 5:11-cr-00347-RB**
                                                        )
**SERGIO ALEXANDER SALAS,**         )
                                                        )
           **Defendant.**                      )
_____ )

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING DEFENDANT'S MOTIONS TO SUPPRESS

THIS MATTER comes before the Court on Defendant Sergio Sala's Motion to Suppress. (Doc. 15.)  Mr. Salas requests that the Court suppress all evidence seized from his residence on June 25, 2010.  Having held an evidentiary hearing, carefully considered the parties' arguments, and otherwise being fully informed, the Court GRANTS Defendant's Motion to Suppress.

## FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) requires that the Court state its essential factual findings on the record when deciding a motion involving factual issues.  The Court therefore makes the following findings of fact based on the testimony presented at the evidentiary hearing held on May 26, 2011, the exhibits presented, including the CD audio recording made from Officer Daniel's belt mounted recorder, and those facts judicially noticed by the Court.

1.     On the evening of June 24, 2010, Roswell, New Mexico resident Mariano Vargas was walking his dog in the alley behind his house on the 400 block between East Third Street and East Fourth Street.  The dog was off leash and ahead of Mr. Vargas.  Mr. Vargas heard a loud noise, and the dog began to whimper.  Mr. Vargas saw the dog was bleeding and realized it had been shot by one of his neighbors.

2.     Alfred B. Gonzalez, Jr., who lived at home with his father at 411 East Third Street, also heard the noise.  Mr. Gonzalez, Jr. was in his room watching television when he heard a "Pop!", which he described as a "high-powered BB gun," and then a dog yelping.

3.     Concerned that the dog might belong to his girlfriend, who lived across the alley on Fourth Street, Mr. Gonzalez, Jr. ran out the back door of his house to the alley.  When Mr. Gonzalez, Jr. exited the house, he saw Mr. Vargas standing in the alley with the dog. Mr. Vargas accused Mr. Gonzalez, Jr. of shooting the dog and indicated that he was going to call the police.

4.     Officers Daniel and Aguilar of the Roswell Police Department were dispatched to Mr. Vargas' residence at 422 East Fourth Street to respond to a report of "shots fired."  The officers arrived on scene at approximately 7:10 p.m.  Officers Daniel and Aguilar made contact with Mr. Vargas and observed the dog bleeding from what appeared to be a bullet wound to his right hip.  Mr. Vargas indicated that he thought the dog had been shot by one of the neighbors.

5.     Officers Daniel and Aguilar accompanied Mr. Vargas to the alley where the shooting occurred.  There was a blood trail leading down the alley that started between the residences located at 411 and 413 East Third Street.  Both of these residences had chainlink fences surrounding the properties.

6.  When Officers Daniel and Aguilar approached the site of the shooting, Mr. Alfred B. Gonzalez, Sr., who had heard a "thump" and came outside to investigate, was standing in his backyard at 411 East Third Street.  Officers Daniel and Aguilar requested permission to enter Mr. Gonzalez' backyard.  Mr. Gonzalez invited the officers to enter.

7.  Officers Daniel and Aguilar then requested that Mr. Gonzalez' son come outside to speak with them about the shooting.  The officers questioned Mr. Gonzalez, Jr. about whether he had shot the dog, as Mr. Vargas was asserting he was responsible.  Mr. Gonzalez, Jr. indicated that he had not shot the dog and would not do such a thing.

8.  While Officer Aguilar was talking to the Gonzalez family, Officer Daniel, walked back to the alley on two occasions to speak with Mr. Vargas.  The second time, Officer Daniel indicated that Mr. Vargas should go home, and they would return to his house once they finished their investigation.

9.  Officers Daniel and Aguilar continued to question Mr. Gonzalez, Jr. about whether he shot the dog and eventually requested permission to search the residence for firearms to eliminate Mr. Gonzalez, Jr. and his father as suspects in their investigation.  Mr. Gonzalez, Sr. refused to allow them to search his house without a warrant.

10. At this point, the officers directed their attention next door to the residence at 413 East Third Street.  The officers inquired who lived in the house, and Mr. Gonzalez, Jr. indicated that a young person had taken over the house from his grandmother, who was in a nursing home.

11. The home at 413 East Third Street belonged to Defendant Sergio Salas, who had just received an honorable discharge from the United States Army after serving six years on active duty, during which he had been deployed to Iraq, Afghanistan, and Syria.  After his discharge, Defendant moved back home to Roswell, New Mexico to take care of the house

at the request of his great grandmother who had been placed in an assisted living facility.

12.   At this point, there is a disturbing and potentially significant factual dispute with regard to Officer Daniel's testimony at the evidentiary hearing. Officer Daniel testified that he stayed in Mr. Gonzalez' backyard, while Officer Aguilar went around to the front of the house to attempt to make contact with Defendant. Officer Daniel stated that Officer Aguilar then appeared in the back of the residence, and he jumped over the fence to meet him by the back porch, at which point, he saw shell casings underneath the porch. This version of events, however, was contradicted by the testimony of Mr. Gonzalez, Sr., the testimony of Mr. Gonzalez, Jr., and the audio from Officer Daniel's belt recorder. Furthermore, when recalled as a rebuttal witness, Officer Daniel repeatedly stated that he did not recall or did not remember the events. Accordingly, the Court rejects Officer Daniel's testimony concerning these facts and adopts that version of events consistent with the neighbors' testimony and the audio from the belt recorder.

13.   Leaving the Gonzalez' backyard, Officer Daniel went out to the alley and proceeded next door to the back of 413 East Third Street. Mr. Salas' backyard had a gate facing the alley, which was secured by a chain and a padlock. Undeterred, Officer Daniel climbed over the fence on the left side of the gate by stepping on top of the residence's gas meter, located on the outside of the fence, and using his right hand to support himself on the tall metal pole where the gate locked, which was located directly to his right.

14.   Officer Daniel walked from the alley toward the back of the house, scanning the ground with his eyes. He proceeded past an outbuilding located to his left, up a path that led to the back porch steps, between two bushes, and then around to the left side of the porch that stuck out from the back of Defendant's house. Underneath the porch and up against the back of the

house, he observed two .22 caliber shell casings.

15.    Officer Daniel then signaled to Officer Aguilar, pointing down at the ground where the shell casings were located.  Officer Aguilar then joined Officer Daniel, crossing over Mr. Salas' fence from the alley the same way that Officer Daniel had done.

16.    The officers found the .22 shell casings consistent with the type of weapon that likely caused the dog's wound, which appeared to be from a small caliber bullet.

17.    Next, Officer Aguilar indicated that he was going to go around to the front of the house to attempt to make contact with the residence's occupants.  Officer Daniel asked if he should accompany him.  Officer Aguilar stated that Officer Daniel should remain in the backyard.

18.    Officer Aguilar made contact with Defendant at the front door.  After two unsuccessful attempts to raise Officer Aguilar on his radio, Officer Daniel became concerned for his fellow officer's safety and decided to walk around to the front of the house where he found Officer Aguilar speaking with Defendant.

19.    The officers informed Defendant of what had occurred and requested permission to search his house.  Defendant refused to grant the officers access to his residence.  Defendant was then instructed to wait outside the house while the officers obtained a search warrant.

20.    Officer Daniel drafted the affidavit for the search warrant, using the discovery of the shell casings as the basis for probable cause.  The warrant was approved by a judge, and the officers executed the warrant at approximately 9.53 p.m. on June 24, 2010.

21.    Upon execution of the warrant, the officers seized a .22 caliber rifle and a silencer from Defendant's garage.  Additionally, the officers found numerous other .22 caliber shell casings in the backyard, all located underneath the porch and along the back of the house.

22.    An account in Defendant's name for water and sewer service to the property was opened on

April 2, 2010.  The water meter for the house is located in the front yard of the residence.

Defendant generally kept the front gate to his house locked with a padlock.  When the water

company would come to read the meter, they would reach over the top of the fence in the

front yard, which faced East Third Street, to remove the lid and check the meter.

23.     There was a gas meter located on the outside of the fence at the edge of the backyard by the

alley.  There was also an electric meter attached to the back side of the house in the carport

area.  Defendant indicated that he would generally let the electric company onto the property

through the front gate so that they could read the meter.

24.     Defendant used his backyard for intimate gatherings with family and friends.  For instance,

when Defendant returned home from the Army, he invited his family over for a welcome

home celebration, and they gathered in the backyard to cook food and have drinks.  Another

time, Defendant's wife invited her friends and their children to come over for a reunion.

25.     Mr. Salas' back gate is always kept chained and locked, and it is never accessed by the

public or visitors to the house.

## CONCLUSIONS OF LAW

1.      The Fourth Amendment to the United States Constitution protects the right of the people to

be secure in their homes against unreasonable intrusions by law enforcement:

> It is axiomatic that the physical entry of the home is the chief evil against
> which the wording of the Fourth Amendment is directed.  The principal
> protection against unnecessary intrusions into the home by police is the
> Fourth Amendment's warrant requirement.  Thus, warrantless searches and
> seizures inside the home are presumptively unreasonable.

*United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008) (internal quotations and

citations omitted).  This right to be free from unreasonable intrusions in one's home also

extends to the home's curtilage. *United States v. Dunn*, 480 U.S. 294, 300 (1987).  The

curtilage is generally defined as "the area immediately surrounding a dwelling house." *Id*.

As the curtilage, like one's domicile, is entitled to a higher expectation of privacy, the

primary issue in the case at hand is whether the officers unlawfully entered upon the

curtilage to view the shell casings.  The Court concludes that the officers did invade the

curtilage without a warrant, and that the officers were not acting under any exception to the

Fourth Amendment's warrant requirement; therefore, they clearly violated Defendant's

constitutional right to be free from unreasonable intrusions in his home.

2.      "[T]he extent of the curtilage is determined by factors that bear upon whether an individual

reasonably may expect that the area in question should be treated as the home itself." *Id*.

The Court's central inquiry must therefore focus on "whether the area harbors the intimate

activity associated with the sanctity of a man's home and the privacies of life." *Id*. (internal

quotations omitted).  In *Dunn*, the Supreme Court enunciated a four-factor test to help

resolve curtilage questions: "[1] the proximity of the area claimed to be curtilage to the

home, [2] whether the area is included within an enclosure surrounding the home, [3] the

nature of the uses to which the area is put, and [4] the steps taken by the resident to protect

the area from observation by people passing by." *Id*. at 301.  In the case at hand, Defendant's

fenced-in backyard was immediately adjacent to his home, the porch under which the shell

casings were found was attached to the back of the house, and the shell casings were lying

up against the home itself.  To view the shell casings, the officers had to go past the back

porch, approach the house to a very close distance, and then look underneath the porch.

Accordingly, the proximity of the area searched to the home and the fact it was within an

enclosure surrounding the home militate in favor of it being considered part of the curtilage.

3.      The nature of the uses to which Defendant and his family put the backyard also militates in

favor of it being considered part of the curtilage.  Defendant held a family reunion in the backyard when he returned home, his family relaxed and cooked food in the backyard, and his wife held a reunion for her friends and their young children when she returned to Roswell. "Such activities are related to the intimate activities normally associated with the home." *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997).

4.   Defendant additionally took steps to protect the backyard and the porch area from view by the general public.  Although much of the backyard was visible to those using the alley (there was no tall fence obscuring the view), this does not mean that the yard was open to viewing by members of the general public.  The yard was located in the back of the house and not visible from a public street, in contrast to the front of the residence which faced on East Third Street.  Additionally, there was an outbuilding, several bushes, a tree, and fences which partially obscured the backyard from view, particularly the porch area.  Finally, the shell casings the officers found could not be viewed from the alley, as they were located next to the house and under the back porch.  Thus, the Court concludes that Defendant took steps to protect the backyard and the area underneath the porch from view by the general public, and this weighs in favor of the area being considered part of the curtilage.

5.   Finally, the fact that Defendant took steps to exclude the public from the backyard militates in favor of finding it fell within the curtilage.  Defendant kept his backyard permanently locked, and it was not accessible from the street by salesmen, neighbors, or other visitors. *See United States v. Cousins*, 455 F.3d 1116, 1123 (10th Cir. 2006) ("Inviting such persons onto their property further shows that the [defendants] did not take steps to protect the area from observation.").  Thus, this is not a case where a member of the public could have easily entered upon the property and discovered the shell casings.

6.    The Court therefore concludes that the facts of this case weigh in favor of considering the

      backyard and the area underneath the porch as part of the home's curtilage.  Defendant did

      not have to build a high, impenetrable fence that completely blocked the view from the alley

      in order for his backyard and porch to be considered part of the home's curtilage. *See*

      *Jenkins*, 124 F.3d at 773.  The location of the backyard and porch on the back of the house,

      away from the public street, the fact that the yard was not easily viewed or accessed by the

      general public, the presence of a locked fence, the fact that the yard and back porch were at

      least partially shielded from view, and the very intimate uses to which Defendant put the

      backyard weigh heavily in favor of it being included in the curtilage.

7.    Generally, the back porch is considered an intimate part of the home where the family may

      gather for solace from everyday life without being disturbed by uninvited visitors.  The fact

      that the shell casings were found in this part of the yard, as opposed to next to the fence or

      in the middle of the yard, lends additional credence to Defendant's assertion that this area

      was part of the home's curtilage.  Therefore, having analyzed the four *Dunn* factors, the

      Court concludes that Defendant's backyard constituted part of the curtilage.  Moreover, even

      if it were a close call with regard to whether the entire backyard should be considered part

      of the curtilage, the area where the officers found the shell casings, in very close proximity

      to the house and underneath the back porch, clearly falls within the curtilage.

8.    Neverthelss, the government argues that, even if the backyard is considered part of the

      curtilage, the evidence seized should still be admitted under the plain view exception to the

      warrant requirement. (Doc. 16 at 6–9.) Under the plain view doctrine, officers do not violate

      the Fourth Amendment by observing evidence that is in plain sight. *Texas v. Brown*, 460

      U.S. 730, 737–39  (1983).  However, police must not "violate the Fourth Amendment in

arriving at the place from which the evidence could be plainly viewed." *United States v. French*, 291 F.3d 945, 952–54 (7th Cir. 2002).  As the officers were unable to view the shell casings from the alley, and the government has failed to establish that the officers entered Defendant's backyard for a lawful purpose or under an exception to the warrant clause, the Court concludes that the plain view doctrine does not apply.

9.    In its memorandum, the government argued that Officer Daniel entered Defendant's backyard out of concern for the safety of his fellow officer. (Doc. 16 at 9.)  This theory, however, is completely unsupported by the facts of the case.  The government had indicated in its memorandum that it believed Officer Daniel entered the backyard and encountered the shell casings only after Officer Aguilar had gone around to the front door to make contact with Defendant.  The government asserted that Officer Daniel was unable to make contact with Officer Aguilar on his radio, and therefore, he jumped over the fence from the Gonzalez' backyard and saw the shell casings as he ran toward the front of Defendant's house.  However, these are clearly not the facts of the case, and the Court's factual findings provide no indication that exigent circumstances led Officer Daniel to enter the backyard and discover the shell casings.  Accordingly, the Court concludes the exigent circumstances exception to the warrant requirement does not apply.

10.    Furthermore, the evidence does not indicate that the officers inadvertently discovered the shell casings as part of an attempt to make contact with Defendant and interview him about the shooting. *See United States v. Garcia*, 997 F.2d 1273, (9th Cir. 1993) ("no search, and hence no Fourth Amendment violation, occurred when officers observed criminal activity with the naked eye from a vantage point accessible to the general public"); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) ("there is nothing unlawful or unreasonable about

going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person"); *United States v. Wheeler*, 641 F.2d 1321, 1327 (9th Cir. 1981) (concluding that officer was acting with legitimate purpose when he looked over a fence to call out to defendant in backyard and spotted contraband); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977) ("We cannot say that the agent's action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search."). Rather, the officers entered Defendant's backyard to search the enclosure for evidence of criminal activity before ever attempting to make contact with Defendant. The officers did not first go to the front door to find Defendant, they did not call out, they did not request permission to enter, and they did not even go to the back door and knock. Instead, they jumped the fence and began scanning the ground with their eyes and looking for evidence. Consequently, the Court concludes that the officers did not inadvertently discover the evidence in plain view as part of a lawful attempt to approach the residence by a path accessible to the public and make contact with Defendant.

11.     In sum, the Court concludes that Defendant's backyard, and even more so the back porch, were part of the curtilage. Accordingly, by entering onto the curtilage to search for evidence of the crime they were investigating, the officers violated Defendant's Fourth Amendment right to be free from unreasonable intrusions into his home. As the shell casings were clearly not visible from the alley, and the officers were not acting under exigent circumstances or attempting to contact Defendant when they entered upon the curtilage, none of the exceptions to the warrant requirement cited by the government apply. Therefore, all evidence derived from this Fourth Amendment violation must be suppressed as fruit of

the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963).  Since the shell

casings were used as the basis of probable cause for a warrant to search Defendant's home,

the Court concludes that the .22 caliber rifle, the silencer, and any other evidence seized

during the execution of the warrant must be suppressed.


### ORDER

**WHEREFORE**, the Court hereby **GRANTS** Defendant's Motion to Suppress. (Doc. 15.)


 

**ROBERT BRACK**
**UNITED STATES DISTRICT JUDGE**